**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| **CHARLES CADWELL,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) **CAUSE NO. 1:14-cv-1157-WTL-MJD** |
| | ) |
| **SUN LIFE ASSURANCE COMPANY** | ) |
| **OF CANADA and STEEL DYNAMICS,** | ) |
| **INC. DISABILITY PLAN,** | ) |
| | ) |
| **Defendants.** | ) |

**ENTRY ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

The Plaintiff brings this action against the Defendants under the Employee Retirement

Income Security Act ("ERISA"), alleging that the Defendants wrongfully terminated his long-

term disability benefits and discontinued his life insurance premium waiver benefit.  This cause

is before the Court on the parties' cross-motions for summary judgment.  [Dkt. Nos. 34 & 40]

Both motions are fully briefed, and the Court, being duly advised, now **DENIES** the Plaintiff's

motion [Dkt. No. 34] and **GRANTS** the Defendants' motion [Dkt. No. 40] for the reasons and to

the extent set forth below.

## I.        STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if

the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  In ruling on a motion for summary judgment, the

admissible evidence presented by the non-moving party must be believed, and all reasonable

inferences must be drawn in the non-movant's favor.  *Hemsworth v. Quotesmith.com, Inc.*, 476

F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view

the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.").

When the Court reviews cross-motions for summary judgment, as is the case here, "we construe all inferences in favor of the party against whom the motion under consideration is made." *Speciale v. Blue Cross & Blue Shield Ass'n*, 538 F.3d 615, 621 (7th Cir. 2008) (quotation omitted).  However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490. Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.,* 242 F.3d 713, 723 (7th Cir. 2001).

## II.    FACTUAL BACKGROUND

The facts of record relevant to the Court's decision follow.[1]

Defendant Steel Dynamics, Inc. Disability Plan ("the Plan") is an employee benefit plan issued and administered by Sun Life Assurance Company of Canada ("Sun Life").  In relevant part, the Plan contained both a long-term disability benefit ("LTD Benefit") and an employee life insurance benefit ("Life Insurance Benefit").

---

[1]  The medical evidence in the record is extensive and includes the Plaintiff's treatment for a variety of conditions.  The Plaintiff lists his disabling impairments as "stomach cancer, extensive surgery on his abdomen, post-surgery complications, post chemotherapy [sic] symptoms, dumping syndrome, chronic pain, and chronic fatigue and weakness."  Compl. ¶ 10. Because the Court understands the Plaintiff to assert that he is disabled due to these conditions, the Court has limited its recitation of the facts to those relevant to such conditions.

The LTD Benefit provided financial protection to eligible participants by paying a portion of their income upon total disability.  For the LTD Benefit, the Plan defined "Total Disability," in relevant part, as follows:

> The Employee, because of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation.  The loss of a professional or occupational license or the inability to obtain or qualify for a license for any reason does not, in itself, constitute Total Disability.

Dkt. No. 38-13 at 26.  The Plan also defined "Own Occupation" as follows:

> The usual and customary employment, business, trade, profession, or vocation that the Employee performed as it is generally recognized in the national economy immediately prior to the first date Total or Partial Disability began.  Own Occupation is not limited to the job or position the Employee performed for the Employer or performed at any specific location.

*Id.* at 25.

The Life Insurance Benefit contained a waiver of premium provision, allowing an employee to receive life insurance without premium payment following total disability.  The Plan defined "Total Disability" for the Life Insurance Benefit differently than for the LTD Benefit, requiring the employee to be totally disabled from "any occupation" rather than from his "own occupation."  Specifically, under the Life Insurance Benefit, "Total Disability or Totally Disabled means an Employee, because of Injury or Sickness, is unable to perform the material and substantial duties of *any occupation* for which he is or becomes reasonably qualified for by education, training or experience."  *Id.* at 21 (emphasis added).

The Plaintiff was employed by Steel Dynamics as a general manager beginning in May 2006 and participated in the Plan.  Steel Dynamics completed an employer statement for Sun Life as a part of his application for the LTD Benefit.  *See* Dkt. No. 38-5 at 22-24.  It described the Plaintiff's major job duties as "desk work" and "phone work" and indicated that the position allowed the Plaintiff to sit, stand, walk, and drive "at will" with occasional bending/stooping,

reaching above the shoulder, kneeling, and lifting or carrying ten pounds.  *Id.* at 23-24.  The job

duties also included answering customer complaints and supervising one employee.  *Id.* at 24.

The position involved exposure to dust, fumes, and gases.  *Id.*  In a typical work day, it required

the Plaintiff to balance continuously and never to climb, push, pull, crawl, or crouch.  *Id.*

      In January 2012, the Plaintiff was diagnosed with gastric cancer that had metastasized to

his spleen and pancreas.  The Plaintiff began pre-operative chemotherapy in January 2012.  In

late March 2012, he stopped working to undergo surgery on March 28, 2012, to remove his

stomach, spleen, and part of his pancreas.  In April 2012, he developed post-operative

complications, including wound infection, fluid drainage issues, thrush, and pneumonia.  As a

result, he was hospitalized, and his post-operative chemotherapy treatments were delayed until

he recovered from those conditions.

      Prior to beginning post-operative chemotherapy, the Plaintiff applied in early July 2012

for the LTD Benefit.  *See* Dkt. No. 38-2 at 19.  In his application, the Plaintiff described his

condition and its first symptoms by stating "Gastric Cancer – Removal of stomach, pancres [sic],

and spleen. (Foul oder [sic] when burping.)."  *Id.* at 34.

      The Plaintiff's surgeon, Dr. Attila Nakeeb, examined him on July 10, 2012.  Dr. Nakeeb

indicated that the Plaintiff was "doing quite well" and that "[h]is postoperative wound infection

ha[d] completely healed."  Dkt. No. 38-7 at 20.  He also reported that the Plaintiff "denies any

nausea, vomiting, fevers, chills.  He has been tolerating a regular diet without any difficulties.

His appetite is good.  He is complaining of a little bit of diarrhea over the last 2 days, but

otherwise feels as good as he has felt since his surgery."  *Id.*

      On July 18, 2012, Dr. Mark Tatara, the Plaintiff's primary care physician, completed an

Attending Physician's Statement questionnaire ("APS") for the Plaintiff's LTD Benefit request.

*See* Dkt. No. 38-2 at 22-24.  He described the Plaintiff's diagnosis, including any complications, as gastric cancer and ascites.  *Id.* at 22.  He also remarked that the Plaintiff "presently has cancer and has 2-3 months of chemotherapy remaining," but was capable of frequent sitting, standing, bending, pushing, pulling, and crawling in a typical workday.  *Id.* at 23-24.  Dr. Tatara also indicated that the Plaintiff could, in a typical workday, occasionally squat, balance, and kneel, but his ability to drive, walk, climb, twist, or lift or carry 15 pounds was negligible.  *Id.* at 23.  Moreover, Dr. Tatara noted that the Plaintiff's physical impairments required sedentary capacity restrictions.  *Id.*  He did not, however, provide a response to the question, "Is the patient capable of working within these restrictions/limitations?"  *Id.*

On July 25, 2012, the Plaintiff's oncologist, Dr. Sreenivasa Nattam, noted that the Plaintiff "has done well recovering at home," but that he "has some problems with dumping syndrome" and had "lost about 40 pounds in this whole ordeal."  Dkt. No. 38-9 at 51.  Dr. Nattam also indicated that he "[does] not have much knowledge about treatment of dumping syndrome."  *Id.*  He noted that the Plaintiff was going to see him for a follow appointment on August 6, 2012, to resume chemotherapy.  *Id.*

The Plaintiff received chemotherapy on August 27, 2012.  *See* Dkt. No. 38-3 at 94.  He was seen by Leslie Edgar, a nurse practitioner.  She opined that "[p]atient is doing amazingly well."  *Id.*  She noted that "[h]is primary complaint is one of diarrhea, but his surgeon has given some medicine that really helped."  *Id.*  She also noted that "[h]e has been able to maintain his weight," and that "[h]e denies any nausea."  *Id.*

On September 17, 2012, the Plaintiff received another round of chemotherapy.  *Id.* at 93.  He was again seen by Ms. Edgar.  Notes from that visit indicated that he had one final chemotherapy treatment remaining.  *See id.*  The notes also indicate that he had "done well" in

his treatments and that "[h]e really has not had much weight loss.  He continues to work fulltime.  He does have some dumping syndrome and diarrhea, but it is tolerable.  He also has some nausea, but he [sic] not really had any emesis."  *Id.*  He was to return to see Dr. Nattam in two months for a follow-up visit.  *Id.*

On September 27, 2012, Sun Life approved coverage under the LTD Plan, finding that the Plaintiff became disabled under the policy on March 26, 2012.  Dkt. No. 38-3 at 37.  The Plaintiff received a monthly benefit of $8,194.16.  *Id.*

On November 16, 2012, in notes from a follow-up visit, Dr. Nattam stated that the Plaintiff had "recovered well and other than the fact that he has the expected dumping syndrome, he is doing great."  Dkt. No. 38-5 at 45.  He further described that the Plaintiff appeared to have no residual tumor and 32 lymph nodes were negative, which Dr. Nattam described as "an excellent report showing complete pathologic remission" of the Plaintiff's cancer.  *Id.*

On December 6, 2012, Sun Life called the Plaintiff, and the Plaintiff summarized his then-current symptoms as "fatigue, excessive diarrhea, dumping syndrome, using the restroom for up to one hour at a time, and numbness in his right hand."  Dkt. No. 35 at ¶ 18 (citing Dkt. No. 38-1 at 10).  The Plaintiff "explained that if he overeats by one bite, he experiences dumping syndrome" and that "there is no way to know if he is having one bite too many."  *Id.*  He also indicated that his doctor gave him medication, but that he did not think that was the best solution.  Dkt. No. 38-1 at 10.  Sun Life also noted that the Plaintiff did not think he could return to work at that time "given the dumping syndrome."  *Id.*

On December 18, 2012, Sun Life reviewed the Plaintiff's claim file to determine if the Plaintiff's then-current condition met the "Total Disability" definition for the Life Insurance Benefit's waiver of premium provision.  Dkt. No. 38-4 at 98.  In Sun Life's internal notes, it

described his medical condition as a "malignant neoplasm of the stomach" and discussed that he

had had gastric surgery, removing his stomach, spleen and part of his pancreas, "which left him

weak and anemic." *Id.* In addition, it described that he began chemotherapy "when his strength

was up," but did not list any additional conditions or treatments. Sun Life determined that, "due

to his diagnosis, treatment, and need for recovery," he was totally disabled per the Life Insurance

Benefit's definition. *Id.*

On January 7, 2013, Sun Life notified the Plaintiff's employer that it had approved a

waiver of the Plaintiff's life insurance premiums because, effective March 27, 2012, he was

found by Sun Life to be "totally disabled" under the terms of the Life Insurance Benefit. Dkt.

No. 38-4 at 95.

Around that same time, as part of its ongoing claims management, Sun Life referred the

Plaintiff's file for a medical records review. Christine Allen, a registered nurse, provided a

response dated January 21, 2013. *See*, id. at 26. She reviewed the Plaintiff's records and noted

that the Plaintiff's restrictions and limitations were "really unclear" and that there were

"inconsistencies in the medical record." *Id.* at 27. She concluded that the "documentation is

insufficient to support that [the Plaintiff's] condition would preclude sedentary or light level

activity," but recommended the following:

> obtaining updated treatment notes and lab work from 10/1/12 to the present from
> Dr. Nattam in addition to an updated [APS] addressing [the Plaintiff's] functional
> limitations. If the dumping syndrome prevents [the Plaintiff] from returning to
> work we need documentation from the provider treating this condition.
> Specifically, we need to understand how often the diarrhea is occurring? If the
> diarrhea is frequent, has there been weight loss? Records from [the Plaintiff's]
> diettician [sic] may also be helpful in providing insight into the severity of this
> condition.

*Id.*  Ms. Allen also recommended that Sun Life seek additional information on the Plaintiff's complaints of fatigue.  *Id.*  Based on Ms. Allen's recommendations, Sun Life sought updated medical records and another APS.

On February 12, 2013, the Plaintiff applied for Social Security disability benefits related to the following: "Stage 4 Stomach Cancer," "Metastasis to Pancreas," and "Complications of Surgery."  Dkt. No. 38-8 at 25.  The LTD Benefit required the Plaintiff to apply, and Sun Life referred the Plaintiff to a service that assisted him with his application.  Dkt. No. 35 at 25 (citation omitted).  On April 10, 2013, without a hearing, the Social Security Administration determined that the Plaintiff was disabled and awarded him benefits.  *Id.*  The Social Security Administration flagged the Plaintiff's claim as a "Compassionate Allowance" claim and noted that medical improvement was not expected.[2]  Dkt. No. 38-8 at 25, 28.  Sun Life was notified of the award on May 28, 2013.  Dkt. No. 35 at 25 (citing Dkt. No. 38-6 at 55-56).

On April 30, 3013, Sun Life received an APS dated April 22, 2013, from Dr. Tatara.  *See* Dkt. No. 38-5 at 34-38.  In the APS, Dr. Tatara noted that the Plaintiff's condition had improved, Dkt. No. 38-5 at 36, but that his physical impairments still required sedentary capacity restrictions, *id.* at 37.  He indicated that the Plaintiff could drive during a typical work day and that he could occasionally walk, sit, stand, and lift or carry five pounds, but that his ability to

---

[2] "The Compassionate Allowances . . . initiative is a way to expedite the processing of claims applicants whose medical conditions are so severe that their conditions obviously meet Social Security's definition of disability."  Social Security Administration, Compassionate Allowance Frequently Asked Questions, "What is the Compassionate Allowances Initiative?" https://www.ssa.gov/compassionateallowances/cal_faqs.htm#&a0=3, (as visited Dec. 1, 2015). Stomach cancers that are inoperable, unresectable, recurrent, or with metastases meet the compassionate allowance designation criteria.  *See* Social Security Administration, Program Operations Manual System DI 23022.335, available at http://policy.ssa.gov/poms.nsf/lnx/0423022335 (as visited Dec. 1, 2015).

bend, squat, climb, twist, push, pull, balance, kneel, crawl, and reach above shoulder level were negligible. *Id.* at 36.

Sun Life also sought other information in its ongoing management of the Plaintiff's claim. Specifically, it requested background information from a third party, had a vocational consultant conduct an occupational analysis of the Plaintiff's position, and had a physician review the Plaintiff's medical records.

On May 9, 2013, Sun Life hired a third party to conduct a background investigation. *See* Dkt. No. 38-5 at 51-61. As part of that investigation, the contractor called the Willows Restaurant, which is owned by the Plaintiff. An employee of the restaurant answered and indicated that the Plaintiff was not there, but that he came to the restaurant every day, but did not have set hours. *Id.* at 59. As an example, she said that he was in early the prior day, worked throughout the morning, and left in the afternoon. *Id.* She also reported that the Plaintiff did ordering and paperwork and was responsible for the restaurant's hiring. *Id.* at 60. The contractor called the restaurant again in the evening, reaching the Plaintiff. *Id.* He said that he would be at the restaurant for another 30 minutes and would not be returning until noon the following day. *Id.*

On June 17, 2013, a vocational consultant completed an occupational analysis of the Plaintiff's position. *See* Dkt. No. 38-6 at 64-65. Prior to the analysis, Sun Life had not received a job description from Steel Dynamics. *Id.* at 66. Using information from Steel Dynamics' June 12, 2012, employer statement (Dkt. No. 38-1 at 22-24), the consultant found the Plaintiff's occupation to correspond most closely with the enhanced Dictionary of Occupational Titles

("eDOT") code for "General Manager, Industrial Organization."  *Id.* at 64.  She further

concluded, relying on ERI,[3] that the Plaintiff's occupation was sedentary.  *Id.*

On July 16, 2013, Dr. Calvin Fuhrmann, a physician board certified in internal and

pulmonary medicine, conducted a review of the Plaintiff's medical records.  *See* Dkt. No. 38-6 at

81-83.  Dr. Fuhrmann's opinion was as follows:

> Review of the medical records from Dr. Nattam clearly indicates that the claimant's
> condition has improved dramatically.  He has gained weight.  His dumping
> syndrome is entirely resolved and this combined with the other information
> contained in the chart clearly indicates that the attending physician felt he could do
> sedentary [work] and I do not believe the restrictions of him only being able to
> occasionally walk, sit, and stand are supported.  I do not believe that the lifting
> restrictions are supported.  It is therefore my considered medical opinion that based
> on the recently received medical information from the claimant's primary
> oncologist that the claimant is capable of sedentary responsibilities.

*Id.* at 82.  In forming his opinion, Dr. Fuhrmann "[took] into consideration the medical

records, as well as a detailed surveillance program that was carried out indicating that the

claimant is currently capable of working in one of his business [sic]."  *Id.*  In particular, he

considered Dr. Nattam's treatment records, the Plaintiff's December 2012, description of

ongoing symptoms, and Dr. Tatara's APS from April 22, 2013, which indicated that the

Plaintiff could perform sedentary work with restrictions.  Dr. Fuhrmann, however, did not

believe that the medical evidence supported restrictions limiting the Plaintiff to lifting five

pounds and occasional walking, sitting, and standing.  *Id.*  Instead, he stated that "if the

claimant continues to remain tumor free, I believe he will be able to return to his usual

capacity.  At the present time, he is being monitored and an optimistic attitude would be

that he, in fact, has benefited from a cure of this disease."  *Id.*

---

[3]  Sun Life explained that "ERI" stands for "Economic Research Institute" and provided a
description of the organization, its purpose, and the relationship of eDOT, DOT and ERI.  *See*
Dkt. No. 41 at 25 n. 3 & n. 4.

On September 19, 2013, Sun Life sent the Plaintiff a letter informing him that it had reviewed his file and found that he no longer qualified for Sun Life's Life Insurance Benefit's waiver of premium "[s]ince the medical information in [his] file does not support [his] inability to perform any occupation, [he] no longer [met] the definition of disability as stated in the Policy." Dkt. No. 38-6 at 88.  The letter discussed his medical records and occupational review and provided information regarding his appeal rights.  *See id.* at 86-89.

That same day, a Sun Life representative and the Plaintiff spoke by telephone.  Dkt. No 38-6 at 93-94.  They discussed, among other things, the termination of the Life Insurance Benefit's waiver of premium and the Plaintiff's ongoing symptoms.  *Id.  See also* Dkt. No. 38-7 at 83 (describing discussion).  They also discussed the need for additional medical information and another physician-conducted medical record review.  *Id.*

As part of its ongoing background investigation, a third party surveilled the Plaintiff on September 27 and 28, 2013.  *See* Dkt. Nos. 38-7 at 10-17; Dkt. No. 38-14.  It did not observe the Plaintiff at all on September 27, 2013, but on September 28, 2013, it observed him mowing his front lawn with a gas-powered push lawnmower.  While pushing the lawnmower with one or both hands, he was observed reaching, bending, and stepping up and down a curb.  *See* Dkt. No. 38-14.  The investigation company recommended that Sun Life undertake additional surveillance, which it did from October 3 through 5, 2013.  *See* Dkt. No. 38-7 at 39-45.  During that three-day span, it did not observe the Plaintiff at any time, but observed others entering and exiting his residence.  *Id.*

In response to its request for additional medical records, Sun Life received an office note dated January 20, 2013, from Dr. Nakeeb; an office note dated May 29, 2013, from Dr. Nattam;

and from Dr. Tartara, an office note regarding an August 23, 2013, visit and lab results dated July 20, 2012 and December 17, 2012.

Dr. Nakeeb's office note from a January 20, 2013, follow-up visit explained that the Plaintiff "states that he gets occasional upper quadrant abdominal pain after eating, a little bit of nausea, and still has kind of a mild amount of dumping syndrome. . . , but otherwise is doing well." Dkt. No. 38-7 at 19.  The Plaintiff indicated to Dr. Nakeeb that, two to three weeks prior, he was jaundiced and had blood in his urine.  *Id.*  He was told by another physician that he had gallstones.  *Id.*  Based on this information, Dr. Nakeeb wanted to review the other physician's records "to rule out any common bile duct stones and gallstones."  *Id.*  It does not appear from the record that the Plaintiff returned to Dr. Nakeeb following this visit.

Dr. Nattam's May 29, 2013, office note stated that there was "no suspicion of recurrence of the Plaintiff's stomach cancer," and Dr. Nattam opined that, "[o]ther than having expected dumping syndrome and fatigue, [the Plaintiff] is doing well."  *Id.* at 67.

On August 23, 2013, Dr. Tatara noted that there was no evidence of gastric cancer at that time.  Dkt. No. 38-7 at 47.  He also "reported that [the] Plaintiff was not feeling tired, had no shortness of breath, no abdominal pain, no nausea, no diarrhea, and no significant weight change."  Dkt. No. 41 at ¶33 (citing Dkt. No. 38-7 at 47).  He assessed the Plaintiff as having thrombosed external hemorrhoids and insomnia.  Dkt. No. 38-7 at 48.

On November 15, 2013, Dr. Fuhrmann completed a second review of the Plaintiff's medical records, including the additional medical documentation Sun Life had received, as well as the results of the third-party background investigation and Sun Life's notes from its September 2013 conversation with the Plaintiff.  *See* Dkt. No. 38-7 at 74-76.  Sun Life asked that Dr. Fuhrmann answer the following questions: "Does the new information change your previous

assessment that there was nothing in the medical record to preclude a return to sedentary work?"

and "Are there any additional medical recommendations at this time?" *Id.* at 74-75.  With regard

to the first question, Dr. Fuhrmann concluded as follows:

> The new information that I have had an opportunity to review clearly confirms the fact that the claimant is capable of sedentary activities.  The claimant was noted to be in an active mode on Friday, September 27th, and Saturday, September 28th.  The claimant was observed attending his place of business, The Willows restaurant.  **On Saturday, September 28th, the claimant successfully completed mowing his lawn with a push mower.  The level of activity required to operate a push mower considering the size of the claimant's lawn clearly indicates that the previous restrictions noted by Dr. Tatara no longer apply.  Dr. Tatara in April 2013 indicated that he did not feel his patient would be capable of pushing or pulling, bending, twisting, and lifting more than five pounds.  The activities observed on 9/28/13 clearly indicate that the claimant's condition has once again improved dramatically.**
>
> To summarize, the claimant's most recent visit to Dr. Tatara indicated that his medical condition was stable.  Dr. Tatara notes that there is no evidence of recurrence of the claimant's cancer.  This positive evaluation by Dr. Tatara combined with the surveillance information and the other documentation clearly indicates that at the present time the claimant is capable of sedentary activities, as noted in my previous report.

*Id.* at 75-76 (emphasis in original).  In response to the second question, Dr. Fuhrmann

recommended that the Plaintiff's records be reviewed every six months because he continued to

receive regular care from both Dr. Nattam and Dr. Tatara.  *Id.* at 76.

On November 22, 2013, Sun Life notified the Plaintiff that it was terminating his LTD

Benefit, effective December 1, 2013.  *Id.* at 79-85.  It concluded as follows:

> Based on the medical and non-medical information in [the Plaintiff]'s file, it is our position that he no longer meets the policy's definition of "Total Disability."  The recent medical review indicates that there is no documentation to support restrictions and limitations which would prevent [the Plaintiff] from performing the material duties of his sedentary occupation as a General Manager.

*Id.* at 84.

Sun Life's letter reviewed the relevant provisions of the policy, summarized the various medical record reviews, noted the conclusion of its claims review, and outlined the Plaintiff's appeal rights.  The letter also addressed the Social Security Administration's determination granting benefits to the Plaintiff:  It stated that the decision "was made several months ago" and that "the information utilized in making this [] determination may not have taken into consideration the updated medical and vocational information presently contained in [Sun Life's] file."  *Id.*

Following Sun Life's termination of his benefits, the Plaintiff's saw Dr. Nattam on December 4, 2013.  In his assessment, Dr. Nattam stated: "I think [the Plaintiff's] major symptoms are fatigue and dumping syndrome and dizziness and because of that he is unable to work and I totally understand that."  Dkt. No. 38-11 at 66.  He believed the fatigue was "probably related to the chemotherapy-induced anemia" and planned to see the Plaintiff for a follow-up visit in two months.  *Id.*

In January 2014, the Plaintiff also received treatment, including surgery, for a fractured ankle after he was "walking through [a] snow bank when [the] ground gave out beneath him causing him to fall forward."  *Id.* at 81.

In a follow-up visit on February 20, 2014, Dr. Nattam noted that the Plaintiff "describe[d] definite dizziness for an hour-and-a-half after eating and then he feels okay and he feels very tired after that."  *Id.* at 63.  Dr. Nattam also noted that the Plaintiff reported "no fatigue" and "no weakness."  *Id.* at 64.  Dr. Nattam concluded that the Plaintiff had "symptoms and signs of

dumping syndrome," *id.* at 65, and an ECOG performance status of 2:[4] "ambulatory and capable of all self-care but unable to carry out any work activities."  *Id.* at 64.

On February 24, 2014, the Plaintiff visited Dr. Tatara for high blood pressure and lightheadedness.  Dkt. No. 38-11 at 54.  That day, Dr. Tatara also completed a "Treating Provider's Statement" ("TPS") created by the Plaintiff's counsel.  *See id.* at 50-53.  Dr. Tatara indicated that the Plaintiff was suffering from symptoms of chronic fatigue, generalized weakness, muscle pain, impaired short-term memory, headaches, abdominal pain, poor concentration, cognitive difficulty, inability to ambulate effectively, and inability to maintain balance when walking.  *See id.* at 50.  He also indicated that the Plaintiff's "concentration, dumping syndrome, pain and fatigueability [sic] prohibit his performing [the duties of his Own Occupation as defined by the Plan]."  *Id.* at 52.  Dr. Tatara indicated that the Plaintiff could occasionally lift ten pounds, raise his arms over shoulder level, and operate a motor vehicle.  *Id.* at 52.  The Plaintiff could also stand for 15 minutes at a time and sit for 4 hours at a time.  *Id.* at 51.  He indicated that the Plaintiff could not work, bend, stoop, balance, lift anything on a frequent basis, or work around dangerous equipment.  *Id.* at 51-52.  He noted that the Plaintiff's pain level was "moderate" and that he was receiving treatment for abdominal pain and hypertension.  *Id.* at 51.  Dr. Tatara did not specify which medications the Plaintiff was taking. *Id.*

On March 3, 2014, Dr. Nattam also completed the same TPS.  *See* Dkt. No. 38-11 at 59-65.  He indicated that the Plaintiff "does not feel good enough to work" and also stated that the

---

[4]  ECOG stands for "Eastern Cooperative Oncology Group," the organization that developed the performance status scale, which is one measure used by hospitals, cancer centers, and clinics to describe how cancer "impacts a patient's daily living abilities."  ECOG-ACRIN CANCER RESEARCH GROUP, "ECOG Performance Status," http://ecog-acrin.org/resources/ecog-performance-status (last visited Feb. 2, 2016).

Plaintiff experienced intermittent severe abdominal pain, dumping syndrome, dizziness, and fatigue. *Id.* at 61. In the same statement, he indicated that the Plaintiff could not work and, in contrast, also indicated that he could stand for two hours in a workday, sit for two hours in a workday, and in general, stand for 15 minutes at a time and sit for an hour at a time. *Id.* at 60. Dr. Nattam also specified that the Plaintiff could raise his arms over shoulder level, but could not bend, stoop, balance, lift anything on an occasional or frequent basis, or work around dangerous equipment. *Id.* at 60-61. In addition, he circled "severe" to describe the Plaintiff's pain level, but also indicated that the Plaintiff was not taking any medication. *Id.* at 60.

On March 18, 2014, the Plaintiff appealed the terminations of both the LTD Benefit and the waiver of premium under the Life Insurance Benefit. *See, e.g.* Dkt. No. 38-7 at 91-109. On appeal, the Plaintiff claimed that he was disabled "due to stomach cancer, extensive surgery of his abdomen, post-surgery complications, post-chemotherapy symptoms, dumping syndrome, chronic pain, and chronic fatigue and weakness." *Id.* at 93 (footnote omitted). The appeal contained several exhibits, including the Plaintiff's complete Social Security Administration disability file, vocational and financial information, and additional medical records. In addition to the appeal document, the Plaintiff provided Sun Life with a revocation of his earlier authorization allowing it to obtain information from his medical providers. Dkt. No. 38-11 at 92. The revocation also retracted the Plaintiff's previous authorization allowing Sun Life to release of his medical records to parties other than his counsel. *Id.*

As part of the appeal review process, Sun Life intended to request an independent medical evaluation of the Plaintiff's records, but it was not authorized to send the Plaintiff's medical records to an independent reviewer. Sun Life contacted the Plaintiff on June 2, 2014, to

inform him that its appeal review would be suspended until it received executed medical

authorization documents.  *Id.* at 106-07.

On June 5, 2014, the Plaintiff supplied Sun Life with a limited medical authorization to

allow for a records review by an independent medical examiner.  Dkt. No. 38-12 at 1-4.  The

Plaintiff did not authorize Sun Life or the independent reviewer to contact the Plantiff's medical

providers directly.  *Id.*  Instead, he required Sun Life and the reviewer to send written questions

to his counsel, who would then send the questions on to the Plaintiff's providers and facilitate

getting written responses from the Plaintiff's providers to Sun Life or the reviewer.  *Id.* at 1.

Dr. Sanjiv Modi, an independent physician board-certified in internal medicine,

hematology, and medical oncology, reviewed the Plaintiff's file.  He did not speak with the

Plaintiff's medical providers in conducting his review.  In a letter dated July 23, 2014, Dr. Modi

summarized his findings.  *See* Dkt. No. 38-12 at 50-57.  He identified the Plaintiff's "[s]tomach

cancer, chemotherapy and surgery causing dumping syndrome, fatigue, dizziness [as]

functionally impairing as of 12/1/13."  *Id.* at 54.  Dr. Modi determined, however, that the extent

of impairments described by Dr. Tatara and Dr. Nattam in their respective TPS documents was

not supported by the medical records reviewed.  *Id.*  He further determined that "[t]he medical

records reviewed do not show any evidence of any cognitive impairment as of 12/1/13" and that

the Plaintiff was "not experiencing any functional impairment due to medication side effects as

of 12/1/13."  *Id.* at 55.  He explained that, based on the records, the Plaintiff had no limitations,

but had the following restrictions as of December 1, 2013:

> [H]e can sit for 30 minutes at a time for 6-8 hours total in an 8-hour day, and he can
> stand and walk for 15 minutes at a time for 6-8 hours total in an 8-hour day.
> Running, bending, squatting, twisting are occasional; hand grip, reaching, typing,
> driving, pushing or pulling are occasional; the claimant can push/pull 20 lbs.
> occasionally and 10 lbs. frequently.  The claimant can lift/carry 10 lbs. frequently

and 20 lbs. occasionally.  The restrictions are due to dumping syndrome causing fatigue and dizziness.

*Id.*  He concluded that the Plaintiff "should have been able to perform full-time sedentary and light work as of 12/1/13 based on medical records reviewed."  *Id.*

As part of its appeal review, Sun Life also requested and received another vocational expert's opinion.  *See* Dkt. No. 38-12 at 5-7.  This expert sought a job description from the Plaintiff's employer, but did not receive one.  *Id.* at 5.  She concluded as follows: "Based on information contained in the employer statement for a position titled General Manager, this vocational consultant is in agreement with the original occupational analysis completed on 6/17/13," which meant that she categorized the Plaintiff's position as sedentary.  *Id.*  She, however, qualified her finding, stating that it was "based on very limited information" and indicated that, if a job description for the Plaintiff's position were received from the employer, "re-review by the vocational department may be warranted."  *Id.*

On August 4, 2014, Sun Life upheld its prior decision terminating the Plaintiff's Life Insurance Benefit's waiver of premium and his LTD Benefit.[5]  Dkt. No. 38-12 at 31-49.  Sun Life's final decision letters referred to the policy provisions at issue and discussed the information it reviewed in reaching its decisions, including information it received from the Plaintiff, medical records, the Plaintiff's treating physicians' opinions, vocational and medical expert opinions, surveillance information, and the Social Security Administration disability file.

With regard to the Plaintiff's claim that he was disabled "due to stomach cancer, extensive surgery of his abdomen, post-surgery complications, post-chemotherapy symptoms, dumping syndrome, chronic pain, and chronic fatigue and weakness," Dkt. No. 38-7 at 93, the

---

[5]  Sun Life provided two separate letters to the Plaintiff, one denying the Life Insurance Benefit's waiver of premium and another denying the LTD Benefit.

letters summarized that Sun Life found that the Plaintiff's conditions did not meet the definitions of "Total Disability" with respect to the LTD Benefit or the Life Insurance Benefit's waiver of premium, Dkt. No. 38-12 at 31-49.

The letters discussed the medical record and opinions of the Plaintiff's treating physicians. They considered Dr. Nattam's various records and TPS, relying on his 2012 and 2013 conclusions that the Plaintiff had sedentary functional capacity and on the fact that Dr. Nattam did not indicate (prior to the 2014 TPS) that the Plaintiff was unable to work. They also discussed Dr. Tatara's 2014 TPS, explaining that Sun Life found "no proof to support or even suggest" cognitive limitations, as the Plaintiff's medical records "do[] not support that [he] has sought or received psychiatric, psychological, neuropsychological and/or any other mental health evaluation or treatment, nor does it appear that he has been referred for such evaluation or treatment." *Id.* at 33, 42.

The letters also discussed approval of disability benefits by the Social Security Administration and Sun Life's assistance in helping the Plaintiff to obtain those benefits. The letter affirming its decision regarding the LTD Benefit explained that Sun Life had six months' worth of information that the Social Security Administration did not have in forming its opinion. *Id.* at 36. It also discussed the Social Security Administration's decision to designate the Plaintiff's condition as a compassionate allowance. *Id.*

In addition, Sun Life addressed the Plaintiff's contention that his position was miscategorized as sedentary by the vocational expert. As stated earlier, the first vocational consultant relied on ERI to conclude that the Plaintiff's occupation was sedentary. Dkt. No. 38-6 at 64. On appeal, the Plaintiff maintained that the DOT guideline placed the position of General Manager, Industrial Organization in the light exertion category. *See* Dkt. No. 38-7 at 93. Sun

Life had another vocational expert conduct an occupational analysis and review of the earlier

vocational expert's opinion.  Sun Life explained that the expert reached the same conclusion as

the first: that the Plaintiff's position was performed at the sedentary level.  *See* Dkt. No. 38-12 at

35-36.

 With respect to surveillance information and medical records relating to the Plaintiff's

ankle injury, the letter denying the LTD Benefit stated the following:

> His documented ability to walk in the snow, along with the video evidence of him
> mowing his lawn on September 28, 2013, and the background investigation
> results that indicate [the Plaintiff] has maintained some level of involvement –
> even if minimal – in the ownership and operation of his restaurant (The Willows),
> all indicate that [the Plaintiff] is able to function at the sedentary to light physical
> exertion level.

*Id.* at 32.  The letter further explained that surveillance evidence, in particular, was "simply one

piece of evidence that is consistent with all the other evidence indicating that [the Plaintiff] can

function at the sedentary to light exertion level."  *Id.* at 36-37.

 Sun life also discussed its reliance on the opinions of Dr. Fuhrmann and Dr. Modi and

their assessments of the Plaintiff's conditions.  In particular, Sun Life explained that it initially

terminated benefits "[b]ased on its evaluation of the available proof, as well as the insight

provided by Dr. Fuhrmann, [because it] determined that the proof did not substantiate disability

beyond November 30, 2013."  *Id.* at 35.  Similarly, Sun Life concluded the following with

respect to the Plaintiff's appeal:[6]

> Based on our review of the entire file, including the additional documentation
> provided on appeal and the insight provided by Dr. Modi, the proof does not
> substantiate that – because of stomach cancer, dumping syndrome, pain, fatigue,
> dizziness, cognitive impairment, and/or any other injury or sickness – [the Plaintiff]
> was unable to perform the material and substantial duties of his sedentary

---

[6]  Sun Life uses nearly identical language in reaching its conclusion upholding the
termination of the Plaintiff's Life Insurance Benefit's waiver of premium.  *See* Dkt. No. 38-12 at
49.

> occupation as a General Manager, Industrial Organization, as of December 1, 2013.
> Even if his occupation were performed at the light physical exertion level . . . the
> proof does not substantiate that . . . [the Plaintiff] would have been unable to
> perform the material and substantial duties of his occupation at that level, either.
> For all of the reasons discussed above, the proof does not support that [the Plaintiff]
> remained disabled as defined by the policy on December 1, 2013.  Therefore, he
> did not qualify for continued LTD benefits and the decision to terminate benefits
> as of November 30, 2013 was correct.  We affirm that determination.

*Id.* at 39.  Finally, the letters informed the Plaintiff that "all administrative remedies have been

exhausted" regarding both claims.  *Id* at 39 & 49, respectively.

### III.   DISCUSSION

The Plaintiff filed this action pursuant to the applicable provision of the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132, seeking the Court's

review of the Plan's termination of his waiver of premium under the Life Insurance Benefit and

his LTD Benefit.  Judicial review of an ERISA administrator's benefits determination is *de novo*

unless the benefits plan grants the administrator discretionary authority in determining eligibility

for benefits or in construing the terms of the plan.  *Firestone Tire & Rubber Co. v. Bruch*, 489

U.S. 101, 115 (1989).  When the administrator has such discretionary authority, as the parties

here agree the Plan allows, the Court applies a deferential arbitrary-and-capricious standard

when reviewing the administrator's decision.  *Jenkins v. Price Waterhouse Long Term Disability*

*Plan*, 564 F.3d 856, 860-61 (7th Cir. 2009); *see also Metropolitan Life Ins. Co. v. Glenn*, 554

U.S. 105, 111 (2008) (discussing deferential review standard's use in such instances).  For

ERISA purposes, "the arbitrary-and-capricious standard . . . is synonymous with abuse of

discretion. . . ."  *Raybourne v. Cigna Life Ins. Co. of New York*, 576 F.3d 444, 449 (7th Cir.

2009).  The abuse of discretion standard of review is deferential, but it "is not a euphemism for a

rubber-stamp."  *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 483 (7th Cir. 2009).  Under this

standard, the Court "must ensure only that a plan administrator's decision has rational support in

the record." *Edwards v. Briggs & Stratton Retirement Plan*, 639 F.3d 355, 360 (7th Cir. 2011) (internal quotation omitted); *see also Raybourne*, 576 F.3d at 449.   A plan administrator's decision is arbitrary and capricious if it "ignores, without explanation, substantial evidence that the claimant has submitted that addresses what the plan itself has defined as the ultimate issue." *Majeski*, 590 F.3d at 484.   Moreover, it is "not [the Court's] function to decide whether [it] would reach the same conclusion as the Plan or even rely on the same authority." *Tegtmeier v. Midwest Operating Engineers Pension Trust Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004) (quotation and citation omitted).   Instead, "[i]f the administrator made an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts, then that decision is final."  *Id.* (citation omitted).

In addition, there exists an inherent conflict of interest when an administrator has the authority to determine eligibility for benefits and also pays claims.  *Glenn*, 554 U.S. at 108.  This conflict does not change the standard of review, *id.* at 115; rather it is treated as "one factor among many" that the Court must consider in its review, *id.* at 116.

The Plaintiff asserts that the termination of his LTD Benefit and the waiver of premium under the Life Insurance Benefit were abuses of discretion, as were Sun Life's appeal determinations.  He maintains that Sun Life's benefits determinations are not supported by substantial evidence.  Dkt. No. 35 at 25.  That is, they were not based on "rational support in the record."  *Edwards*, 639 F.3d at 360 (citation and quotation omitted).  Specifically, the Plaintiff argues that Sun Life selectively reviewed his medical history, singling out information that supported the decision to deny benefits.[7]  He contends that Sun Life improperly discounted his

---

[7]  The Plaintiff's counsel also objects to several portions of the Defendant's statement of material facts on the ground that the facts presented are post-hoc justifications for terminating the claim.  He argues that many of the facts were in front of Sun Life prior to its approving the

subjective complaints and his treating physicians' opinions and gave disproportionate weight to the opinions of Sun Life's own reviewing physician and the independent medical examiner, neither of whom examined the Plaintiff.

### A.      Treating and Reviewing Physicians Opinions

The Supreme Court has made clear that special deference to treating physicians is not required in the context of ERISA benefits determinations. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). "[D]octors are fully able to evaluate medical information, balance the objective data against the subjective opinions of the treating physicians, and render an expert opinion without direct consultation." *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 577 (7th Cir. 2006). Nonetheless, "[p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan*, 538 U.S. at 834. Rather, it is within Sun Life's discretion to depart from the Plaintiff's treating physicians' opinions and adopt a medical consultant's conclusion, as long as the consultant provided non-arbitrary explanations based on the evidence, and the plan itself explained its decision. *See Williams v. Aetna Life Ins. Co.,* 509 F.3d 317, 324-25 (7th Cir. 2007).

The Plaintiff argues that Dr. Fuhrmann's opinions contain "critical" errors that were "fatal to the legitimacy of Dr. Fuhrmann's report," and "Sun Life's failure to address th[ese]

---

Plaintiff's claim for benefits, so they cannot not now be used to justify the Plaintiff's termination of benefits. As a result, the Plaintiff requests that the Court "disregard any of the Defendants' Statement of Material Facts that were not contained in Sun Life's termination letter or Sun Life's letter denying Mr. Cadwell's appeal." Dkt. No. 42 at 2. The Court, however, does not strike or otherwise disregard these facts. Instead, it considers them in the light most favorable to the Plaintiff and in the context of the Plaintiff's argument that they are post-hoc justifications for the termination of benefits.

critical error[s] . . . is an abuse of discretion."  Dkt. No. 42 at 15.  The Plaintiff takes issue with a specific statement in Dr. Fuhrmann's July 2013 report.[8]  In that report, Dr. Fuhrmann concluded that the Plaintiff's dumping syndrome was "entirely resolved."  Dkt. No. 38-6 at 82.  The Plaintiff notes that Dr. Nattam's May 29, 2013, office visit note references the Plaintiff's "'expected dumping syndrome and fatigue'" and finds it "inexplicable why Dr. Fuhrmann concluded that the dumping syndrome had resolved" in light of such information.  Dkt. No. 42 at 15 (citing Dkt. No. 38-7 at 67).  The Court, however, considers another explanation for Dr. Fuhrmann's error:  Dr. Fuhrmann did not have Dr. Nattam's May 29, 2013, office visit note at the time of his July 2013 review.  Sun Life's November 22, 2013, termination of benefits letter clearly indicates that, following a September 19, 2013, request to the Plaintiff for additional medical records, the Plaintiff submitted Dr. Nattam's May 29, 2013, office visit note to Sun Life for the first time.  *See* Dkt. No. 38-7 at 83.  Records available to Dr. Fuhrmann at the time of his July 2013 review indicated continual improvement in the Plaintiff's condition.  His cancer was gone, his dumping syndrome was "tolerable," Dkt No. 38-3 at 93, and he had taken medication for diarrhea that "really helped," *id.* at 94.  There were also indications that the Plaintiff was maintaining his weight.  *Id.* at 93-94.  Based on the records available to Dr. Fuhrmann during his initial review, his conclusion was reasonable.  Therefore, the Court concludes that Sun Life did not abuse its discretion in crediting Dr. Fuhrmann's July 2013 report.

---

[8]  The Plaintiff also takes issue with Dr. Fuhrmann's November 2013 statement that the Plaintiff "was noted to be in an active mode on Friday, September 27th and Saturday, September 28th" and "was observed attending his place of business, The Willows restaurant."  Dkt. No. 42 at 15-16 (citing Dkt. No. 38-7 at 75).  The Plaintiff correctly points out that the third-party investigator clarified that the Plaintiff was not observed at The Willows or otherwise seen by the investigator on Friday, September 27, 2013.  Dkt. No. 42 at 16 (citing Dkt No. 38-7 at 11).  This error on Dr. Fuhrmann's part, however, is not material in light of the fact that the Plaintiff was observed mowing his lawn the following day and thus was "in an active mode" on Saturday, September 28, 2013.

The records reviewed by Dr. Fuhrmann in November 2013 also support his earlier findings. The Plaintiff's cancer remained in remission, and the newly submitted treatment records again indicated continual improvement in the Plaintiff's dumping syndrome, which was characterized as "mild" and "occasional." *See, e.g.*, Dkt. No. 38-7 at 19. In fact, the most up-to-date treatment record at the time of Dr. Fuhrmann's second review did not mention dumping syndrome and indicated that the Plaintiff was not feeling tired; had no abdominal pain, nausea, or diarrhea; and had experienced no significant weight change. *Id.* at 47.

Despite the reasonableness of Dr. Fuhrmann's conclusions, he was not the only physician to review the Plaintiff's file. As part of Sun Life's review of the Plaintiff's termination of benefits appeal, Dr. Modi, an independent medical examiner, conducted a review. Sun Life's decision to "'seek[] independent expert advice is [in itself] evidence of a thorough investigation.'" *Davis*, 444 F.3d at 575 (quoting *Hightshue v. AIG Life Ins. Co.*, 135 F.3d 1144, 1148 (7th Cir. 1998)).

Dr. Modi's review included the records examined by Dr. Fuhrmann and additional records submitted by the Plaintiff during the appeal process. He identified the Plaintiff's "[s]tomach cancer, chemotherapy and surgery causing dumping syndrome, fatigue, dizziness [as] functionally impairing as of 12/1/13." Dkt. No. 38-12 at 54. Dr. Modi agreed that the Plaintiff had physical restrictions, but determined that the extent of impairments described by Dr. Tatara and Dr. Nattam in their respective 2014 TPS documents was not supported by the medical records reviewed. *Id.* He concluded that the Plaintiff was capable of both sedentary and light-exertion work.[9] *Id.* at 55.

---

[9] The Plaintiff also argues that it was an abuse of discretion for Sun Life's vocational experts to characterize his occupation as sedentary rather than finding it to require light exertion. Dkt. No. 35 at 28-31. The Court need not address this potential error because it would be

Both Dr. Fuhrmann and Dr. Modi provided detailed, non-arbitrary explanations for disagreeing with the Plaintiff's treating physicians and supporting the belief that the records did not favor his continuing claim for benefits.  As previously noted, the Plaintiff's medical records do not overwhelmingly support his disability claim.[10]  *Cf. Holmstrom v. Metropolitan Life Ins. Co.*, 615 F.3d 758, 775 (7th Cir. 2010) (finding denial of benefits arbitrary and capricious in light of treating physician's medical record that "so overwhelming[ly]" supported plaintiff's disability).  Instead, the Plaintiff's treating physicians indicated that there was no suspicion of recurrence of the Plaintiff's gastric cancer following his surgery and chemotherapy treatments.  *See, e.g.*, Dkt. No. 38-7 at 67.  Moreover, the treatment records indicated continual improvement in the Plaintiff's overall condition, characterizing the Plaintiff's dumping syndrome as "expected," "mild," "occasional," and "tolerable."  *See, e.g.*, Dkt. Nos. 38-7 at 19, 67; 38-3 at 93.  There are also repeated indications that the Plaintiff was able to maintain his weight and experienced no significant weight loss.  Dkt. Nos. 38-3 at 93-94; 38-7 at 47.  Furthermore, Dr. Fuhrmann believed that "the previous restrictions noted by Dr. Tatara no longer apply" as of September 28, 2013, the day the Plaintiff was surveilled mowing his lawn.  Dkt. No. 38-7 at 75.  And, Dr. Modi found the extent of impairments described by Dr. Tatara and Dr. Nattam in their respective 2014 TPS documents not supported by the medical records he reviewed.  Dkt. No. 38-12 at 54.  The restrictions indicated by Dr. Tatara and Dr. Nattam are inconsistent with other information provided by those same physicians, and inconsistencies in a treating physician's own

---

harmless.  In response to the Plaintiff's appeal of his termination of benefits, Sun Life concluded that the Plaintiff could perform both sedentary and light exertion work.  *See* Dkt. No. 38-12 at 39, 49.

[10]  Regarding the Plaintiff's fatigue, *see, e.g.*, Dkt. No. 38-7 at 67 (Plaintiff experiencing "expected . . . fatigue") and *id.* at 47 (Plaintiff "not feeling tired"), showing varying results on the Plaintiff's condition.

opinion support an administrator's decision to rely on its reviewing physicians.  *Davis*, 444 F.3d at 578.

Although it is true that the Plaintiff presented evidence that he continued to experience corollary effects of gastric cancer, fatigue and dumping syndrome included, the record contains substantial evidence supporting Sun Life's conclusion that his condition did not meet the definitions of disabled in the applicable provisions of the Plan.  That Sun Life chose to accept evidence that it found more persuasive than other pieces of evidence does not compel a finding that it abused its discretion.  *See Fischer v. Liberty Life Assur. Co. of Boston,* 576 F.3d 369, 377 (7th Cir. 2009) ("While Fischer did present substantial evidence that his condition was organic, it was not an abuse of discretion for Liberty to reject Fischer's evidence in favor of contrary and, at least in Liberty's view, more compelling evidence"); *see also Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 607 (7th Cir. 2007) (finding that "the Plan did not act improperly when it looked to, and credited, evidence that conflicted with the Plaintiff's treating physicians' opinions"); *cf. Leger v. Tribune Co. Long Term Disability Ben. Plan*, 557 F.3d 823, 833 (7th Cir. 2009) (finding arbitrary and capricious plan's decision to terminate benefits where there was "some merit" to the plaintiff's argument that it "cherry-picked [] statements from her medical history that supported the decision to terminate her benefits, while ignoring a wealth of evidence to support her claim that she was totally disabled").  As such, Sun Life's decision is this regard was based on rational support in the record and thus, was not arbitrary and capricious.  *Green v. UPS Health & Welfare Package for Retired Employees,* 595 F.3d 734, 738 (7th Cir. 2010) (noting that the fiduciary's decision "is not arbitrary and capricious if it falls within the range of reasonable interpretations").

**B.     Surveillance Video**

The Plaintiff also claims that "[o]ne of Sun Life's main reasons for terminating the claim was the surveillance conducted" and asserts that the surveillance instead supports his claim because he was not observed engaging in any activity on three out of the four days that a third party surveilled his house.  Dkt. No. 35 at 31.  Sun Life responds that the surveillance was not one of the main reasons for its benefits termination decision; rather the video of the Plaintiff mowing his lawn "'is simply one piece of evidence that is **consistent with all the other evidence** indicating that [Plaintiff] can function at the sedentary to light exertion level.'"  Dkt. No. 41 at 28 (emphasis in original) (quoting Dkt. No. 38-12 at 36-37).  The Court agrees with Sun Life.  Sun Life reasonably considered the surveillance information as evidence contradicting the Plaintiff's disability claim.  Dr. Tatara reported that the Plaintiff could engage only negligibly in bending, squatting, twisting, pushing, pulling, balancing, or reaching above shoulder level, yet he was observed doing all of these things comfortably while mowing his lawn.  After reviewing the surveillance documentation, Dr. Fuhrmann found Dr. Tatara's restrictions to "no longer apply."  Dkt. No. 38-7 at 75.  The Court finds it reasonable that Sun Life's decision was in part based on the surveillance evidence and Dr. Fuhrmann's evaluation of the surveillance evidence. Again, Sun Life's reliance on the surveillance evidence as one piece of evidence supporting its decision "did not render its decision either arbitrary or capricious."  *Mote*, 502 F.3d at 609-10 (finding termination of benefits not arbitrary and capricious where treating physicians concluded that claimant was subject to particular physical restrictions and therefore disabled, but surveillance video contradicted physicians' restrictions and conclusion).  The Court finds that the surveillance evidence provides additional rational support for Sun Life's decision.

### C.    Social Security Administration's Determination

The Plaintiff contends that Sun Life's assistance in his Social Security disability benefits application process "casts doubt on Sun Life's determination that [he] was no longer disabled from performing his Own Occupation."  Dkt. No. 35 at 26.  To support his position, the Plaintiff relies on the reasoning in *Ladd v. ITT Corp.*, 148 F.3d 753 (7th Cir. 1998).  In *Ladd*, the Seventh Circuit found the administrator's denial of benefits to be arbitrary and capricious where the claimant received Social Security disability benefits after the plan administrator provided the claimant with legal representation during the Social Security disability benefits application process.  *Id.* at 756.  The Seventh Circuit, however, did not base its arbitrary-and-capricious finding solely on the fact that the plan administrator provided the claimant with legal representation.  Instead, the *Ladd* court based its decision on several facts that are distinguishable from the facts in this case.  For example, in *Ladd*, the plan administrator denied the claimant's benefits in the face of "uncontradicted evidence that [the claimant]'s condition was worse when [it] denied her claim than it had been when the Social Security Administration granted it."  *Id.* at 755-56.  In addition, the plan administrator ignored the advice of its independent medical reviewer, who recommended that the claimant be examined by a neurosurgeon who could then support or refute the examiner's conclusion that the claimant could perform sedentary work.  *Id.* at 755.  The Court suggested that "if [the independent medical reviewer] had given reasons for disagreeing with the assessments by [the examining physicians, who determined that the claimant was disabled], and the ALJ, [it] would have to affirm [the denial of benefits] under the deferential standard."  *Id.* at 756.

In this case, the medical records submitted to Sun Life following the Social Security Administration's benefits determination do not present uncontradicted evidence that the Plaintiff's condition was worse when Sun Life terminated the Plaintiff's benefits than when the Social

Security Administration granted them.  In addition, Sun Life did not ignore a recommendation by its independent medical examiner for further examination of the Plaintiff; nor, as previously noted, did the independent medical reviewer in this case fail to provide reasons for disagreeing with the Plaintiff's treating physician's TPS documents.  *See supra* pp. 17-18.

Sun Life weighed the Social Security Administration's determination in its termination of benefits and appeal letters and explained why it disagreed with the Social Security Administration's determination.  *See* Dkt. Nos. 38-7 at 84; 38-12 at 36, 46.  It explained that it received additional medical and vocational information that the Social Security Administration may not have evaluated in making its determination.  Dkt. No. 38-7 at 84.  It further reasoned that the additional medical documentation it reviewed "indicate[d] that [the Plaintiff]'s condition *did* improve after surgery and chemotherapy."  Dkt. No. 38-12 at 57 (emphasis in original).  Sun Life reasonably considered the Social Security Administration's decision and was not bound by it.  As a result, Sun Life's reaching a conclusion different from the Social Security Administration's determination does not render its decision arbitrary and capricious.  *Cf. Holmstrom*, 615 F.3d at 773 (finding administrator's decision arbitrary and capricious where it never stated why it disagreed with the Social Security Administration's disability determination).

### D.    Conflict of Interest

The Plaintiff maintains that Sun Life's decision to terminate his benefits was influenced by Sun Life's inherent conflict of interest, which exists because it both determines who is eligible to receive benefits and pays benefit recipients.  The existence of such a conflict of interest is one factor to be considered in determining whether a decision was arbitrary and capricious.  *Glenn*, 554 U.S. at 108 ("a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits").  "It

is [] not the existence of a conflict of interest – which is a given in almost all ERISA cases – but the *gravity* of the conflict, as inferred from the circumstances, that is critical." *Marrs v. Motorola, Inc.*, 577 F.3d 783, 789 (7th Cir. 2009) (emphasis in original).  Determining the gravity of the conflict requires reviewing "the circumstances of the case, including the reasonableness of the procedures by which the plan administrator decided the claim, any safeguards the plan administrator has erected to minimize the conflict of interest, and the terms of employment of the plan administrator's staff that decides benefit claims." *Majeski*, 590 F.3d at 482 (citing *Marrs*, 577 F.3d at 789).  "When the case is borderline . . . the inherent conflict of interest . . . can push it over the edge – towards a finding of capriciousness." *Jenkins*, 564 F.3d at 861-62 (citing *Glenn*, 554 U.S. at 117).

The Plaintiff has not shown that this is a close case requiring the Court to rely on the inherent conflict of interest to push the case over the edge toward capriciousness.  There is no evidence that Sun Life used unreasonable procedures to decide the Plaintiff's claim or that the terms of employment of Sun Life's staff improperly influenced their decisionmaking.  Instead, the facts show that Sun Life set up safeguards, such as seeking the opinion of an independent medical reviewer, to minimize its inherent conflict of interest.  The circumstances suggest, and the Court finds, that Sun Life's inherent conflict of interest did not influence its decision to terminate the Plaintiff's benefits.

## IV.   CONCLUSION

For the reasons detailed in this entry, the Court **DENIES** Plaintiff's Motion for Summary Judgment and **GRANTS** Defendant's Motion for Summary Judgment.  Final judgment shall be entered accordingly.

SO ORDERED: 2/16/16

_William T Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana